THE STATE OF KANSAS, *ex rel. Attorney General*, v. L. H. STEVENS, *et al.*

HARPER COUNTY, *of Fraudulent Organization, but Regarded by the Governor as Valid; Made Valid, Because so Recognized by the Legislature.* Although the original organization of Harper county was fraudulent, yet as it as a county had a *de facto* organization, and as the records of such organization appear regular and valid upon their face, and as the governor has recognized and proclaimed such organization, *held*, that the recognition thereafter of the validity of such county organization by the legislature of the state makes the same valid and binding. (*State v. Pawnee County*, 12 Kas. 426.)

## Original Proceedings in Quo Warranto.

ON the 17th of October, 1878, Willard Davis, attorney general, as relator, brought an action in this court in the name of *The State of Kansas*, plaintiff, against *L. H. Stevens, J. B. Glenn* and *F. B. Singer*, acting county commissioners within and for the county of Harper, in the state of Kansas, and *Edwin McKennary*, acting sheriff of said county, and *R. W. Dawson*, acting probate judge of said county, defendants, to inquire by what warrant or authority said county commissioners, said sheriff and said probate judge exercise the pow-

ers and discharge the duties of the respective offices by them severally occupied and claimed, as aforesaid. On the 30th of October, 1878, the case was duly submitted on the pleadings and evidence therein, and on the 26th of November, 1878, the opinion was filed. All necessary facts are contained in the subjoined opinion.

*Willard Davis,* attorney general, for The State:

The question of fraudulent county organizations has been considered by this court in *State v. Comm'rs Pawnee Co.,* 12 Kas. 426, and *State v. Comm'rs Ford Co.,* 12 Kas. 441; but the exact point here insisted on was not before the court in either of those cases. The only point to be considered in this case is, that although the papers for the organization of the county appear regular on their face, yet as a matter of fact, admitted by defendants, they were forged; that there were not twenty residents or householders in said county to sign the memorial, and really no inhabitants who could be the subject of a census; that there were no residents and qualified electors in Harper county to be appointed to the offices, and no residents or qualified electors were appointed; that the persons purporting to have been appointed were not residents and qualified electors of Harper county, and had not been before that time, were not then, nor were they ever, at any time thereafter.

County commissioners must be qualified electors of the county, (§ 2, ch. 74, Laws 1871,) and the appointment of any other than qualified electors would be void, *ab initio,* and would not make them *de facto* officers, nor create a *de facto* organization. Then the query is, if these persons purporting to have been appointed to the offices by Governor Osborn were not residents and qualified electors of the county, and were never there, and did not at any time act as officers, or perform or transact any official business within the territory or limits of said county, were they *de facto* officers, and was there a *de facto* organization of said county?

Bouvier says that "an officer *de facto* is one who performs

the duties of an office with apparent right;" but in this case there were no duties performed by *de facto* officers, and no *de facto* officers who performed any duty. Then, while the organization of this county was proclaimed on paper, could there be a *de facto* organization without the personal presence in the county at some time, *in propriis personis*, of those who claimed and assumed to be officers of said county?

Then, if there was not actually a *de facto* organization existing at the time of the passage of § 28, ch. 77, laws of 1874, would that law have the effect to create a *de facto* organization, or to legalize and validate a reputed organization that never had an actual, tangible existence? Could such an imposition upon the legislature, (for such it is now acknowledged and admitted to have been,) have the effect to force upon a county, and a subsequent population, and fasten upon them forever, against their will, an organization that never had an actual existence, *de facto* or otherwise, and one in which the persons purporting to have been appointed officers were absolutely mythical and had no personal existence, so far as ever having been residents or qualified electors of Harper county is concerned? There is no record in existence, so far as exhibited by these pleadings, which shows that any person or persons, at any time, performed or attempted to perform any official act or acts for the use and benefit or in behalf of Harper county, or for any inhabitants claimed to be in said county. Then what was there for the legislature to legalize or validate?

It is not claimed that when a municipal corporation is once properly and legally instituted, it is dissolved, or that it lapses by a failure to elect officers, or for a *non user* of the corporate franchises. (Dill. on Mun. Corp., § 110.) But it must be understood that this principle is to apply only in cases where the organization was properly and legally created, or where it has been validated by the proper authority in cases where there was any question about the legality of the original organization. If it is claimed that papers were signed appointing certain persons therein named to the offices

in Harper county, and that such papers are proper and valid upon their face, it is answered that such persons did not act as officers for said county, *de facto* or otherwise, at that time, nor at any time thereafter, and they were not acting as such officers on the 7th day of March, 1874, and therefore § 28, ch. 77, laws of 1874, did not validate an existing organization, or create one. The fraud, originally entering into the pretended organization and that pretended organization being immediately abandoned, vitiated and dissolved it long before the legislature passed any act which could be construed into recognition. By the failure of the pretended appointees to act and to perform the duties of their pretended offices, the organization was not perfected, was not finished, and therefore failed, and the act of the legislature did not finish and perfect it. In the Pawnee county case, 12 Kas. 438, speaking of the date of the pretended organization of the county, the court say: "From that time up to the present, it has exercised all the powers and duties of a legally-organized county," the very thing that never was done in Harper county; and it was that continued exercise of the powers and duties of a *de facto* organization that gave force and effect to the act which, in the opinion of the court, made valid the organization of Pawnee county, and which is not true in this case. It is not denied that the legislature can organize a county, but then it must clearly appear that such was the intention of the legislature. No such intention appears in this case.

If that organization failed or was not perfected, then as in the Ford county case "there was nothing for the legislature to ratify or make valid." And further, "we cannot think that said recognition by the legislature created any county organization." In the Pawnee county case, the organization was not held valid before the recognition, and it was only held valid after that time, because of the continued active existence of the *de facto* organization. But if a *de facto* organization were instituted on the 20th of August, 1873, it was confessedly only temporary, and could not exist perpetually. It was, under the law, only instituted to give the inhabitants

of Harper county an opportunity to make a permanent organization. It was the duty of the temporary officers to lay off the county into townships, give thirty days' notice, and call an election to elect permanent county officers. None of these proceedings were had, and even the annual election of November, 1873, passed off and no permanent county officers were elected. When free from design or fraud, (2 Kent, 296,) this would not necessarily invalidate the official acts of those officers holding over, yet it would seem reasonable that in a case of this kind, where the organization was confessedly both temporary and fraudulent, a failure to comply with the law and elect officers and perfect the organization, as was done in this case, would have a tendency to put an end to said temporary and fraudulent organization.

· When the facts became known in 1875, the house refused to recognize the organization of said county by refusing to admit a representative. (See House Journal 1875, pp. 145, 280.) This indicates the intention of that body.

*Peck, Ryan & Johnson,* for defendants.

The opinion of the court was delivered by

HORTON, C. J.: This is a proceeding in the nature of *quo warranto,* to oust from office the county commissioners, sheriff and probate judge of Harper county. The confessed object of the institution of the action is to legally determine whether the county of Harper has a valid organization as a county. The records of the organization of August 20, 1873, would seem to be regular and valid upon their face; yet it is admitted, by all parties to the suit, that these papers were forged; that there were not twenty residents or householders in the county at the signing of the memorial or the taking of the census. The records purporting to show a valid organization, are simply "the refuge of lies and the hiding-place of falsehoods." If this were all that is apparent in the case, then, within *The State v. Ford County,* 12 Kas. 441, and *The State v. Sillon,* ante, p. 207, we would be

compelled to hold the organization of the county void, and the defendants to be wrongfully exercising the duties of their respective offices. But the legislature has intervened since the so-called organization was had, and by its action recognized, ratified and made valid that which was fraudulent in its inception.

At its session commencing January 10th, 1874, William H. Hornor was admitted as a member of the legislature, and as a representative therein from said county of Harper, and served as such member during the entire session of 1874.

By section 28, chapter 77, laws of 1874, the board of county commissioners of Harper county was authorized and empowered to issue and sell or exchange the bonds of the county, to an amount not exceeding the sum of $15,000, or so much thereof as might be necessary, for the purpose of funding certain outstanding county warrants to pay the current expenses of the county for the year 1874. This act presupposed the existence at some prior time of a county organization and a county tribunal that transacted county business. From August 20, 1873, to September 1, 1873, there was at least a *de facto* organization of the county in existence. The governor then recognized the organization as valid, and had it proclaimed to be valid and complete. Within the authority of *The State v. Pawnee County*, 12 Kas. 426, the legislative recognition of the validity of such county organization made the same valid, although the original organization was defective and fraudulent. It is contended, however, by the counsel for the state, that if a *de facto* organization was instituted on the 20th of August, 1873, it was only temporary; and that as there never was any election in the county since, and as there have not been, since about September 1, 1873, up to August 5, 1878, any officers in the county, the said temporary and fraudulent organization ended in September, 1873, and the legislative recognition in 1874 had no effect to legalize or validate it.

The reasoning is not sound. For a time, though a brief one, a *de facto* organization actually existed. The legisla-

ture, having the whole control of the matter, recognized such organization, and thereby ratified it. Whatever the actual facts may be, we are bound to presume that the legislature of 1874 had full knowledge of the situation of affairs in the county, and passed the act of that year with a complete understanding of its consequences. The removal of the officers from the county, and the failure to elect officers, did not blot out or destroy the organization, given life by legislative recognition.

Judge Dillon says: "Municipal corporations may become inert, or dormant, or their functions may be suspended for want of officers or of inhabitants, but dissolved, when created by any act of the legislature, and once in existence, they cannot be, by reason of any default or abuse of powers conferred, either on the part of the officers or inhabitants of the incorporated place. As they can exist only by legislative sanction, so they cannot be dissolved, or cease to exist, except by legislative consent, or pursuant to legislative provision." (Mun. Corp., vol. 1, § 112.)

The same principle is applicable to counties, which are *quasi* municipal corporations, created by the sovereign power of the state, of its own sovereign will, for the purposes of civil administration.

The point made, that there never was any *de facto* organization, for the reason that the persons appointed special county officers in August, 1873, were not residents and qualified electors of the county, and were never there, is not well taken, as the record of the case does not support this assertion. The answer alleges, that these officers were appointed by Governor Osborn, and afterward removed from the county, and these allegations are admitted to be true.

Judgment will therefore be duly rendered in favor of the defendants for all costs.

All the Justices concurring.