## COFFIN et al. v. BOARD OF COM'RS OF KEARNEY COUNTY.

### (Circuit Court of Appeals, Eighth Circuit. July 10, 1893.)

### No. 231.

1. MUNICIPAL CORPORATIONS—BONDS—POWER TO ISSUE.

    When the power of a municipal corporation to issue negotiable paper is called in question, it will not be deduced from uncertain inferences, and can be conferred only by language which leaves no reasonable doubt of an intention to confer it. Brenham v. Bank, 12 Sup. Ct. Rep. 559, 144 U. S. 173, followed.

2. SAME—CONSTRUCTION OF KANSAS STATUTE.

    Laws Kan. 1876, c. 63, § 1, concerning the organization of new counties, contained a proviso that "no bonds of any kind shall be issued by any county * * * within one year after the organization" thereof. This act was afterwards amended, (1 Gen. St. Kan. pp. 535, 536, § 120,) and the proviso was changed to the following: "That no bonds * * * shall be voted for and issued * * * within one year after the organization." *Held*, that the words "voted for" were a further restriction, and not an enlargement, of the power of counties, and that funding bonds were within the prohibition of the act.

3. SAME—RECITALS—ESTOPPEL.

    A purchaser of municipal bonds is bound to ascertain whether the municipality has power to issue them, and an utter want of such power is not cured by any recitals in the bonds. Dixon Co. v. Field, 4 Sup. Ct. Rep. 315, 111 U. S. 83, followed.

4. SAME—KANSAS STATUTE.

    Under Gen. St. Kan. pp. 535, 536, § 120, declaring that after certain steps have been taken a new county "shall be deemed duly organized, provided that no bonds shall be issued * * * within one year after the organization," a county, after taking such steps, is not "duly organized" for the purpose of issuing bonds, and is not estopped by any recitals in its bonds to show that they were issued within the forbidden time, and are therefore invalid in the hands of bona fide holders. State v. Commissioners of Haskell Co., 19 Pac. Rep. 362, 40 Kan. 65, approved.

5. SAME—MATTERS OF PUBLIC RECORD.

    Municipalities are not estopped by recitals in their bonds, except as to matters of fact, nor even then if the facts recited are matters of public record, open to the inspection of every inquirer. Sutliff v. Commissioners, 13 Sup. Ct. Rep. 318, 147 U. S. 230, followed.

6. SAME—KANSAS STATUTE.

    1 Gen. St. Kan. pp. 535, 536, § 120, providing for the organization of counties, declared that after certain steps had been taken the governor should appoint county officers, upon whose qualification the county should be deemed "duly organized," provided no county bonds should be issued within one year thereafter. An examination of the records in the executive department of the state would show the date of the appointment of such county officers. *Held*, that all purchasers of bonds were charged with notice of such date, and that the county was not estopped to deny the validity of bonds issued within one year thereafter, as against a bona fide holder.

In Error to the Circuit Court of the United States for the District of Kansas.

At Law. Action on county bonds by William Edward Coffin, Walter Stanton, and Charles Fawcett Street, partners as Coffin & Stanton, against the board of county commissioners of the county of Kearney, Kan. The circuit court overruled a demurrer to defendant's plea, and on plaintiff's refusal to plead further gave judgment for defendant. Plaintiffs bring error. Affirmed.

Statement by THAYER, District Judge:

This was a suit on county bonds which were issued by Kearney county, Kan., on August 1, 1888, for the purpose of refunding its outstanding indebtedness. Each bond contained the following recital:

"This bond is one of a series of like tenor, date, and amount, issued to refund outstanding indebtedness of said county of Kearney, duly surrendered and canceled, in conformity to and in full compliance with the provisions of chapter 50, Laws of 1879, approved March 8th, A. D. 1879, entitled 'An act to enable counties, municipal corporations, the boards of education of any city, and school districts, to refund their indebtedness.'

"It is hereby certified and recited that all acts, conditions, and things required to be done precedent to and in the issuing of this bond have been properly done, happened, and performed, in regular and due form as required by law; and that the total indebtedness of said county, inclusive, is within the statutory limits."

Kearney county is one of the newly-organized counties of the state of Kansas. Its territorial limits were defined by an act of the legislature of the state of Kansas, which took effect March 23, 1889, (1 Gen. St. Kan. 1889, p. 522;) but it was organized under and pursuant to the provisions of a law of that state relating to the organization of new counties, which will be found in 1 Gen. St. Kan. pp. 535, 536, the material parts of which are as follows:

"Sec. 120. That when there shall be presented to the governor a memorial signed by four hundred householders who are legal electors of the state of Kansas, of any unorganized county, showing that there are two thousand five hundred bona fide inhabitants in such county, and that four hundred of said two thousand five hundred are householders and reside in said county, and praying for the organization of the same, accompanied by an affidavit attached thereto of at least five freeholders of such county, showing that the signatures to such memorial are genuine signatures of householders and bona fide residents within said unorganized county, residing therein for thirty days prior to the taking of such census, that affiants do believe that there are two thousand five hundred bona fide inhabitants in such county,—it shall be the duty of the governor to appoint some competent, disinterested person who is a citizen of the state and a nonresident of the county, to take the census and ascertain the number of actual bona fide inhabitants, as herein provided, of such unorganized county, who shall also act as assessor, and ascertain as nearly as possible the amount of taxable property that will be within the bounds of said unorganized county in case of its organization. The said census taker shall take and subscribe on oath that he is not interested directly or indirectly in said unorganized county, and that he will not become interested either directly or indirectly in any manner therein during his official term as said census taker, and that he will impartially and faithfully discharge the duties of his office, and that he will truly and correctly make return of the enumerated inhabitants and of the amount of property found by him within the bounds of the said unorganized county. After having qualified as aforesaid, he shall proceed to take the census of such unorganized county on duplicate schedules, by enrolling the names, ages, places of nativity, and actual place of residence, * * * of each of the bona fide inhabitants and the numbers of actual householders as herein provided residing in such unorganized county, and the number of acres of land cultivated by each. * * * The census taker shall register upon said duplicate schedules opposite the name of each legal voter his election for temporary location of county seat, which shall be taken by the governor as the definite expression of said voter, unless there shall be evidence before him that said list has been tampered with and changed. He shall also assess all property, both personal and real, at its true value, in the manner provided by law for taking the assessment in organized counties, and make due return thereof to the governor, upon appropriate schedules in duplicate, with his affidavit sworn to before the clerk of the supreme court of the state, attached thereto, that the census enumeration and assessment contained in said returns are impartial and true. If it appear by such returns that there are in such unorganized county at least two thousand five hundred actual bona fide inhabitants, as herein pro-

vided, and that four hundred of them are householders, and that there is at least one hundred and fifty thousand dollars' worth of property in excess of legal exemption, exclusive of railroad property, of which not less than seventy-five thousand dollars' worth is real estate, the governor shall appoint three persons, citizens of said unorganized county, to act as commissioners, and one to act as county clerk, to whom he shall cause to be delivered the duplicate returns aforesaid, one to act as sheriff, and when the election precincts shall have been established, at least one justice of the peace in each election precinct, and shall designate and declare the place chosen by the greatest number of legal voters to be the temporary county seat; *and from and after the qualification of the county officers appointed under this act the said county shall be deemed to be duly organized: provided, that no bonds except for the erection and furnishing of schoolhouses shall be voted for and issued by any county or township within one year after the organization of such new county, under the provisions of this act.*"

The proviso contained in the foregoing statute which we have italicised first appeared in an act relative to the organization of new counties, which was passed on March 15, 1876. As first enacted the proviso was as follows: "And provided further, that no bonds of any kind shall be issued by any county, township, or school district within one year after the organization of such new county, under the provisions of this act." Laws Kan. 1876, c. 63, § 1.

On March 11, 1887, the act relative to the organization of new counties was amended in some respects, and in the amended act—being the one in force when the bonds in suit were issued—the proviso was made to read as first above quoted.

It is conceded that Kearney county did not become duly organized as a county, within the meaning of the foregoing law, until April 3, 1888; but the bonds in suit were issued on August 1, 1888,—that is to say, within four months succeeding the due organization of the county.

The act referred to in the bonds, and under and by virtue of which they purport to have been issued, is an act which was passed by the legislature of Kansas long prior to the organization of Kearney county, to wit, on March 10, 1879. Vide 1 Gen. St. Kan. 1889, pp. 167, 168. The material portions thereof are as follows: "Every county, every city of the first, second, or third class, the board of education of any city, every township and school district, is hereby authorized and empowered to compromise and refund its matured and maturing indebtedness of every kind and description whatsoever, upon such terms as can be agreed upon, and to issue new bonds, with semiannual interest coupons attached, in payment for any sums so compromised; which bonds shall be issued at not less than par, shall not be for a longer period than thirty years, shall not exceed in amount the actual amount of outstanding indebtedness, and shall not draw a greater interest than six per cent. per annum."

As a defense to the present action the defendant in error pleaded that the bonds sued upon were issued within one year after the temporary organization of Kearney county, and were for that reason issued without authority of law. To such plea the plaintiffs in error filed a demurrer, which was overruled by the circuit court. Thereupon the plaintiffs in error declined to plead further, and a final judgment was entered in favor of the county.

Silas B. Jones and W. H. Rossington, (Charles Blood Smith, on the brief,) for plaintiffs in error.

S. R. Peters, (J. W. Ady and J. C. Nicholson, on the brief,) for defendant in error.

Before SANBORN, Circuit Judge, and SHIRAS and THAYER, District Judges.

THAYER, District Judge, after stating the case as above, delivered the opinion of the court.

The first question presented for our consideration is whether the

proviso contained in the act relative to the organization of new counties (1 Gen. St. Kan. 1889, p. 536, § 120) was intended by the legislature to prohibit newly-organized counties from issuing funding bonds, as authorized by the act of March 10, 1879, or was merely intended as a prohibition against the issuance of those bonds which could only be issued when authorized by a popular vote? Much stress is laid on the fact that the proviso as first adopted on March 15, 1876, declared that "no bonds of any kind shall be issued," etc., whereas the proviso, as amended on March 11, 1887, provides "that no bonds except for the erection and furnishing of schoolhouses shall be voted for and issued." It is said that, as funding bonds, under the general laws of the state of Kansas, may be issued without a popular vote, the addition to the proviso of the words "voted for," by the act of March 11, 1887, is significant, and indicates an intention to except funding bonds from the operation of the proviso.

This, we think, is a very partial view of the question, and one that overlooks some important considerations. It must be borne in mind that the legislature was dealing with newly-organized counties, that would rarely, if ever, have occasion during the first year of their existence to issue bonds for the purpose of funding their outstanding indebtedness, if their affairs were honestly administered. Again, it is hardly probable that the legislature intended to confer on the commissioners of a partially organized county the power to issue any class of bonds at will, during a period when they were deprived of the power to issue every other species of bonds which required the sanction of a popular vote. But a more important consideration is this: It is manifest to us that the restriction upon the power to issue negotiable securities was imposed upon newly-organized counties because the legislature deemed it unwise to confer that power until their affairs had become in a measure settled, and until the machinery for county government had been fully adjusted. We do not have to look far among the records of judicial proceedings in that state to discover the circumstances which probably gave rise to that opinion in the mind of the lawmaker. State v. Stevens, 21 Kan. 210; Lewis v. Comanche Co., 35 Fed. Rep. 343; Id., 133 U. S. 198, 10 Sup. Ct. Rep. 286. In view of the purpose which evidently inspired the proviso in question, it would be strange if the legislature intended to leave the newly-organized political subdivisions of the state at full liberty to issue funding bonds, and no such purpose should be presumed without the clearest evidence that such was the legislative intent; for, if that view should prevail, it might lead to the very train of evils which the lawmaker intended to prevent. The power contended for could be so wielded as to enable a few irresponsible persons, without any practical restraint, to saddle a new and sparsely settled county with a large indebtedness, that would prove a serious impediment to its future growth and prosperity.

Finally, it is proper to call attention to the rule of law which requires the authority of a municipal corporation to issue negotiable

paper to be clearly made out and established whenever the existence of such a power is called in question. A power of that nature will not be deduced from uncertain inferences, and can only be conferred by language which leaves no reasonable doubt of an intention to confer it. Brenham v. Bank, 144 U. S. 173, 182, 12 Sup. Ct. Rep. 559; Ashuelot Nat. Bank v. School Dist. No. 7, (8th Circuit,) —— U. S. App. ——, —— C. C. A. ——, 56 Fed. Rep. 197.

In view of these considerations we have concluded that the proviso to which the discussion relates was intended to prohibit newly-organized counties from issuing bonds of any description until one year after they were duly organized. In our judgment, the words "voted for," which were added to the proviso by the amendment of March 11, 1887, instead of enlarging the power of newly-organized counties to issue bonds, were in fact intended as a further restriction, and were inserted in the proviso for the purpose of preventing such counties, during the first year of their existence, not only from issuing bonds, but from taking any of the preliminary steps requisite to an issue of negotiable securities. We think that this is a more reasonable view of the purpose of the amendment than that which regards it as authorizing newly-organized counties to issue funding bonds.

The next question to be considered arises out of the contention of counsel that the county of Kearney is estopped by the recitals contained in the bonds from asserting as against a bona fide holder thereof that the bonds are invalid. The argument in this behalf may be fairly summarized as follows: It is said that Kearney county, under the terms of the act relating to the organization of new counties, became a "duly-organized" county of the state of Kansas on April 3, 1888, by the appointment by the governor of three persons to act as commissioners, and by their qualification; that the phrase, "shall be deemed to be duly organized," as used in the act, implies that the county is admitted to the family of counties, and becomes vested with whatever powers are possessed by the older counties of the state, under the general laws of the state, including the power to issue funding bonds; and that the proviso heretofore quoted is merely a limitation of the right to exercise that power for a given period, to wit, for one year. From these premises it is argued that, in view of the recitals contained in the bonds herein sued upon, a purchaser thereof in the open market was not required to ascertain if the county had been organized for one year before the bonds were issued; in other words, it is contended, in effect, that the county officials who caused the bonds to be issued, had power to make a representation as to whether the time limited had expired, and that they did make such a representation, which is binding upon the county, whether true or false, in a suit on said bonds by a person who bought them on the faith of their recitals.

With reference to this contention we remark, in the first place, that we cannot assent to the proposition that the phrase "duly organized" must be held to mean that upon the appointment of com-

missioners for a new county, and upon their qualification, such county thereupon becomes vested with whatever powers are possesed at the time by other counties under the general laws of the state. The statute declares that "from and after the qualification of the county officers appointed under this act the said county shall be deemed to be duly organized: provided, that no bonds except for the erection and furnishing of schoolhouses shall be voted for and issued by any county or township within one year after the organization of such new county, under the provisions of this act." It was clearly competent for the legislature to admit a new county into the family of counties, and yet to withhold from such new county, for the time being, some of the powers which the older counties possess. And in view of the fact that the phrase, "said county shall be deemed to be duly organized," is immediately followed by the proviso, we think that the necessary effect of the proviso is to withhold from new counties for the period of one year the power to issue bonds which other counties possess. It declared, in effect, that the county should be deemed an organized county after the qualification of the commissioners, but that the general laws of the state empowering counties to issue bonds should not become operative within such new county until a year after its due organization. The proviso does not, as counsel suppose, impose a limitation upon the exercise of a power which becomes vested in a newly-organized county as soon as commissioners are appointed and qualified, but its effect is to prevent such power from becoming vested in a newly-organized county for a period of one year.

The view that we have thus expressed touching the proper interpretation of the act relating to the organization of new counties appears to be entertained by the supreme court of Kansas. In the case of State v. Commissioners of Haskell Co., 40 Kan. 65, 19 Pac. Rep. 362, the supreme court of that state had occasion to consider whether the proviso prohibiting new counties from issuing bonds during the year succeeding their organization was a valid prohibition, or whether it violated that clause of the constitution of the state which declares that "no bill shall contain more than one subject, which shall be clearly expressed in its title." In considering that question, the court said, in substance, that the organization effected by the appointment and qualification of commissioners for a new county is not "a completed or perfected organization sufficient for all purposes, * * * but at most is only temporary or provisional, * * * and for special and limited purposes." It was further remarked that when the legislature declared that, after "the temporary officers appointed by the governor * * * have qualified, the county shall be deemed duly organized," it meant, and in effect said, that "it should be deemed duly organized, except for certain purposes, including the voting and issuing of bonds." It is manifest from these expressions that the supreme court of Kansas construed the act relating to the organization of new counties as withholding from such communities some of the powers which fully organized and older counties possess, and that among the powers so

withheld was the power to issue negotiable bonds; and this view of the act—that it withholds the power in question for the term of one year, instead of conferring it under certain limitations—overthrows the foundation on which counsel attempt to erect an estoppel, for no doctrine is better established than that a purchaser of municipal bonds is bound to ascertain if the municipality has authority to issue such securities, and that no recital contained in a municipal bond can cure such a defect as an utter want of power in the municipality to execute it. Dixon Co. v. Field, 111 U. S. 83, 4 Sup. Ct. Rep. 315; Town of Coloma v. Eaves, 92 U. S. 484, 490; Marsh v. Fulton Co., 10 Wall. 676; Northern Bank of Toledo v. Porter Tp. Trustees, 110 U. S. 608, 615, 4 Sup. Ct. Rep. 254; Anthony v. Jasper Co., 101 U. S. 693, 697; McClure v. Township of Oxford, 94 U. S. 429.

But, even if we were able to concede, according to the contention of counsel, that a newly-organized county in the state of Kansas is endowed with power during the first year of its existence, and by virtue of the appointment and qualification of commissioners, to issue funding bonds, and that the proviso is a mere limitation as to time, of the mode of exercising that power, still we would not be able to concede the further proposition of counsel that purchasers of bonds issued by such counties are not required to ascertain the age of the county, but may rely as to that upon recitals which such bonds happen to contain. It has frequently been held that municipalities will not be estopped by recitals contained in bonds unless the recitals relate to matters of fact which it may fairly be presumed that the officers of the municipality were left to determine. Town of Coloma v. Eaves, 92 U. S. 484, 490; Dixon Co. v. Field, 111 U. S. 83, 94, 4 Sup. Ct. Rep. 315; Lake Co. v. Graham, 130 U. S. 674, 9 Sup. Ct. Rep. 654; National Bank of Commerce v. Town of Granada, 54 Fed. Rep. 100. And the later decisions on this subject distinctly announce that recitals cannot be relied upon as an estoppel, where the facts recited are matters of public record, and are open to the inspection of every one who is disposed to make inquiries. Sutliff v. Commissioners, 147 U. S. 230, 235, 13 Sup. Ct. Rep. 318; Nesbit v. Independent Dist., 144 U. S. 610, 12 Sup. Ct. Rep. 746; Dixon Co. v. Field, and Northern Bank of Toledo v. Porter Tp. Trustees, supra. In the present case the fact which rendered the bonds invalid was a matter which could easily have been ascertained from the public records of the state. The act relating to the organization of new counties provides that the commissioners for such counties shall be appointed by the governor. It was at least incumbent on the purchaser of the bonds to ascertain that Kearney county had become a recognized political subdivision of the state. That fact had to be ascertained to enable the bondholder to further ascertain if it had power under any circumstances to issue bonds. And even a casual examination of the record kept in the executive department would have disclosed the fact that commissioners were not even appointed until April 3, 1888, which was less than four months previous to the day on which the bonds bear date. It seems obvious, therefore, that within the

doctrine of the cases last cited, the purchasers of the bonds were bound to take notice of the fact that the bonds in suit had been issued within less than one year after the organization of the county, and were for that reason invalid.

We are of the opinion, therefore, that the circuit court properly overruled the demurrer to the plea, and its judgment is hereby affirmed.